### RYCROFT v. PIERCE.

(Supreme Court, Appellate Division, First Department.    October 25, 1912.)

JUDGMENT (§ 145*)—DEFAULT—VACATION—GROUNDS.

In an action for conversion of certain stocks and bonds belonging to plaintiff, facts *held* to show a sufficiently meritorious defense to entitle defendant to the vacation of a default judgment entered because of his alleged unavoidable absence, on terms providing that the judgment should stand as security for defendant, who stipulated that in the event of his death the action should not abate, but continue against his estate, and that he would waive any objection to plaintiff's testimony on the future trial and pay full costs and a counsel fee to plaintiff's attorney.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 271, 292–295; Dec. Dig. § 145.*]

Scott, J., dissenting.

Appeal from Special Term, New York County.

Action by Alice G. Rycroft against Henry Clay Pierce. From a Special Term order denying a motion to open a default and vacate a judgment against the defendant by default, he appeals.  Reversed.

See, also, 150 App. Div. 931, 135 N. Y. Supp. 1140.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Underwood, Van Vorst & Hoyt, of New York City (Alton B. Parker, of New York City, of counsel), for appellant.

Ralph G. Barclay, of Brooklyn (Robert Stewart, of Brooklyn, of counsel, and Gordon S. D. Kleeberg, of New York City, on the brief), for respondent.

CLARKE, J.   The plaintiff obtained a judgment upon an inquest for $171,149.66 on March 6, 1912.   On April 22, 1912, an order of the Special Term was entered, vacating said judgment upon terms. Upon appeal to this court, said order was reversed, the opinion thereon being reported in 135 N. Y. Supp. 1140.   The order of this court provided, however, as follows:

"Without prejudice to an application at 'Special Term for leave to renew the motion to open the default upon satisfactory proof that the defendant was unable to come to New York to be present at the trial of the case and that he has a defense on the merits."

Thereafter the motion was renewed at the Special Term upon additional papers, and, having there been denied, this appeal is taken. The former record on appeal contained no affidavit of the defendant. That deficiency is supplied in the present record, and the facts now shown present a materially different case upon the merits.

The complaint alleges that on the 26th of May, 1903, plaintiff had a stock account with the firm of Arthur S. Leland & Co., bankers and brokers, composed of 100 shares of the common stock of the Hocking Valley Railroad Company, 500 shares of the common stock of the Atchison, Topeka & Santa Fé Railroad Company, 400 shares of the common stock of the Union Pacific Railroad Company, and 200 shares

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the preferred stock of the Missouri, Kansas & Texas Railroad Company, of the reasonable value on that day of $92,700; that on or about the 25th day of May, 1903, defendant promised and agreed with this plaintiff that if she would transfer her account, as it then existed with Arthur S. Leland & Co., to the firm of Post & Flagg, with whom defendant then had an account, that defendant would attend to, care for, and provide for said account of plaintiff, and keep her fully informed as to its needs, requirements and condition; that, relying upon defendant's statements, demands, and promises, and believing same, she directed and authorized in writing Leland & Co. to deliver to Post & Flagg the stocks and margin belonging to plaintiff; that pursuant to the written authority of plaintiff, dated May 25, 1903, Leland & Co. on the 26th of May delivered to Post & Flagg, bankers and brokers, for and on account of Mrs. Alice G. Rycroft, said stocks, and received from said Post & Flagg, on account of payment thereof, $85,644.82; that Post & Flagg, pursuant to and in conformity with directions given them by defendant, placed all said securities in the account of and to the credit of said defendant as the account then existed upon their books, and without the knowledge, authority, or consent of plaintiff, and without her subsequent ratification of same, and they never advised nor informed her of what had been done, nor gave her any knowledge that her securities had been appropriated and placed to the credit of said defendant, until July, 1909, nor did defendant make known to her in any way what he had done; that on said 26th day of May, 1903, said defendant, by directing and authorizing said Post & Flagg to place the said securities to his credit and account, and they having done so, became possessed of said securities, thereby unlawfully and illegally converting same to his own use; that at some time unknown to this plaintiff, without her knowledge, consent, or authority, or subsequent ratification, said defendant sold, or authorized and directed said Post & Flagg to sell, the said securities and account for the same to him; that pursuant thereto said Post & Flagg did sell said securities, and duly accounted therefor solely to said defendant, and never informed, advised, or made known to plaintiff what they had done with her securities, until the month of July, 1909; that from May 26, 1903, said plaintiff from time to time asked and made inquiry of said defendant about her said account, and was always informed that the same was in existence; that she never authorized, ratified, nor confirmed any of the acts of said defendant complained of, and she was not advised nor informed as to defendant's having illegally and improperly, and without any authority, converted and appropriated unto himself her said securities and proceeds arising therefrom until June 28, 1909, when defendant first so informed her by letter.

Upon the inquest she testified as follows:

"Q. What did he say about this account with Leland & Co.? * * * A. He said, if I would have the account transferred to his brokers in my name, it would put him in a better position. * * * He said he would also guarantee the account. * * * His brokers were Post & Flagg. * * * As a result of that conversation * * * I authorized the transfer. * * * Q When was the first time that you learned that your account had not appeared

upon Post & Flagg's books, if ever? A. That was in June, 1909. I learned it from Mr. Pierce. * * * Q. From the time in May, 1903, when you had authorized and directed the transfer of your account in the name of A. G. Rycroft from Leland & Co. to Post & Flagg, until these communications which are in evidence here of July 30, 1909, and October 26, 1909, had you ever heard from Post & Flagg in regard to that account so transferred? A. No. Q. Had you, at any time from the 26th of May, 1903, down to the time when you learned of these facts in regard to this account, ever authorized or directed any person to transfer those securities from that account in any other name or to any other account than your own? A. Why, no. * * * Q. Had you any knowledge or intimation that the account for those securities had ever been transferred to any account than your own? A. No. Q. During this interval, * * * had you at any time made any inquiries from Mr. Pierce in regard to the account which you had transferred at his request to Post & Flagg? A. Oh, yes. Q. What assurances, if any, had you received from him in answer to those inquiries regarding that account? A. That everything was all right; I had nothing to worry about."

Mr. Post testified:

"Q. Will you kindly state to the jury what was done with those securities and that account, when they were taken over by your firm? A. They were placed in the account standing on our books of 'H. Clay Pierce, Special.' Q. By whose direction did you put them in that account? A. By Mr. Pierce's direction. Q. Subsequently were those stocks disposed of by your firm? A. They were, sir. Q. By whose order, or by whose authority or ratification thereafter? A. They were sold on orders of Mr. Pierce, except the 400 shares of Union Pacific. Q. Did he ratify the sale of them after they were sold? A. He accepted it later; yes. Q. And the proceeds of those stocks were credited to whose account, if any? A. They were credited to the account of 'H. Clay Pierce, Special.' Q. And subsequently transferred? A. I might state that at the time this account was closed out there was a deficiency of $12,000. The deficiency was transferred to Mr. Pierce's regular account. Q. Did you or your firm at any time ever receive any authority from Mrs. Rycroft to transfer that account and those securities to the account of H. Clay Pierce? A. We never heard of Mrs. Rycroft. I never heard that there was such a person existing until we received her first letter * * * on August 30, 1909. Q. You never accounted to Mrs. Rycroft for these stocks, or anything connected with them? A. No. sir; we never heard of Mrs. Rycroft in any way."

In the affidavit filed by Pierce, as required by the order of this court, showing that he had a defense, he says:

"I did not, nor did the firm of Post & Flagg, place the securities mentioned in the complaint to my credit and account; but, on the contrary, the said securities were placed in an account entirely separate and distinct from my own personal account, * * * the said separate and distinct account being designated by my directions upon the books of Post & Flagg as 'H. Clay Pierce, Esq., Special.' No securities belonging to me, or to any one else except the plaintiff, were ever carried in this account, nor were her securities ever mingled with my own. As a matter of accommodation to the plaintiff, * * * I guaranteed the said Post & Flagg against any loss on this special account, and I actually sustained a personal loss in connection with the account amounting to $22,984.15. * * * In 1902, and prior thereto, plaintiff was engaged in a series of stock speculations on margin with various brokerage firms, among whom were the firms of Arthur S. Leland & Co. and Sharp & Bryan. Likewise, on November 14, 1902, I purchased, at the request of the plaintiff and for her account, through the said Post & Flagg, 700 shares of the common stock of the Southern Pacific Railroad Company at the price of $64½ per share, the total cost of such purchase, including the brokers' commissions, being $45,237.50, and I paid on account of such purchase the sum of $10,000, which had been previously furnished to me by the plaintiff. The balance of the purchase price, or $35,237.50, was advanced by Post & Flagg.

who held the said 700 shares  *  *  *  as security for such advance. The said stock was placed by the said Post & Flagg, by my directions and with the consent of the plaintiff, in an account entitled 'H. Clay Pierce, Esq., Special.' I guaranteed Post & Flagg against loss in connection with the said advances,  *  *  *  and the said account was carried by me without any change therein until on or about May 26, 1903.  *  *  *  No other stocks than the aforesaid 700 shares of Southern Pacific Railroad Company stock, carried for plaintiff, were at any time prior thereto carried in such account. Immediately prior to the 26th of May, 1903, the plaintiff requested me to take up and carry for her in the said special account at the office of Post & Flagg the securities mentioned in her complaint.  *  *  *  at that time being carried by the plaintiff at the office of said Arthur S. Leland & Co.  *  *  *  The plaintiff had on said date an equity or margin in said account of only $5,392.68, upon which she was carrying 1,200 shares of speculative securities.  *  *  *  On May 26, 1903, the market price of Southern Pacific Railroad Company was approximately $50 per share, so that the market price of the plaintiff's 700 shares of Southern Pacific stock in the special account at the office of Post & Flagg was only $35,000, against which she owed the sum of $36,312.30; in other words, there was a deficit in her said account at the market price of Southern Pacific stock on May 26, 1903, of $1,312.30. On said date  *  *  *  I consented to direct Post & Flagg to take up the plaintiff's said securities at the office of Arthur S. Leland & Co., and to pay off the debit balance of the plaintiff thereon; the plaintiff on her part agreeing to contribute the sum of $5,000 as additional margin. I received on that day the plaintiff's check for $5,000, and indorsed the same over to the said Post & Flagg, and the said Post & Flagg paid off the plaintiff's debit balance at the office of said Arthur S. Leland & Co., to wit, the said sum of $85,644.82. The said payment was charged against said special account and added to the debit balance due thereon. The said securities were placed in the said special account, which up to that time had contained only the said 700 shares of Southern Pacific stock, and I guaranteed the said Post & Flagg against loss with respect to the said account, as I had previously done when the same only contained the said 700 shares of Southern Pacific stock. On May 29, 1903, I was called upon by Post & Flagg to pay them as additional margin the sum of $10,000, which I paid on said date out of my personal funds. Before paying said sum out of my personal funds, I notified the plaintiff of said demand for margin, and asked her for money. She told me that she had no more money, and at her request I made said payment. As per statement of Post & Flagg of May 31, 1903, the plaintiff's debit balance was $107,156.21, against which the said Post & Flagg held as security, in addition to my guaranty, the following securities: 700 shares of Southern Pacific Railroad Company, 100 shares of Hocking Valley Railroad Company, 500 shares of Atchison, Topeka & Santa Fé Railroad Company, 400 shares of Union Pacific Railroad Company, and 200 shares of Missouri, Kansas & Texas Railroad Company preferred stock. No change was made in said account until August 1, 1903, when a change was made in said account by direction of the plaintiff.  *  *  *  On the evening of July 30, 1903, I received by messenger a note from the plaintiff, written in her handwriting, which reads as follows: '[Monogram] Faythe—Hath—No—Fear. 245 West End Avenue, Thursday, 5 p. m.  Dear Clay: I have held on to Va. Chemical just as long as I can—and I must let it go tomorrow unless we can arrange in this way—you sell my S. P. M. K. T. and Hocking Valley—and take over my Chemical—it will mean a great less in value, and on Chemical I will be getting 5% interest, while on these other stock—*nothing.*  1,300 shares of Chemical will mean about $3,000 less than we are now carrying—and besides getting good interest. Do you think it wise to do this? When my Father estate is settled I shall be able to take the stock back—Clay dear do not think I want to you to do *any more* only to make a in what you are carrying I am going to give the house into the Real Estate peoples hands I will not be able to keep it—and they can get a good price furnished—Please call me up Clay I must know the first thing in the morning—Sincerely, Alice Rycroft.'  *  *  *  Upon receipt of this letter I directed my financial secretary to prepare for me a statement of the account as of July 30, 1903, which

I was carrying for the plaintiff at the office of said Post & Flagg, in order that I might be informed as to the exact condition of said account, and, so informed, come to a conclusion as to whether or not I would accede to plaintiff's request contained in her said letter. A statement of the said account was prepared by my said financial secretary and submitted to me on July 31, 1903, or August 1, 1903, the said statement of account being in words and figures as follows:

"'Statement of Mr. H. C. Pierce's Special Account with Post & Flagg, for Account of Mrs. Alice G. Rycroft. (?)

"'June 30, 1903, the debit balance this account was as per statement rendered $107,591.54. The securities mentioned in said statement were as follows:

| Stock. | As per P. & F.'s statement of July 27th, '03. | | As per market at close of business July 30th, 1903. | |
|---|---|---|---|---|
| †Southern Pacific, | 700, at $41 | $28,700.00 | $44 | $30,800.00 |
| †Hocking Valley, | 100, 75 | 7,500.00 | 80 | 8,000.00# |
| ?Atchison, | 500, 62 | 31,000.00 | 62½ | 31,250.00 |
| Union Pacific, | 400, 73 | 29,200.00 | 75 | 30,000.00 |
| †M. K. & T. Pfd., | 200, 36 | 7,600.00 | 40⅛ | 8,025.00# |
| Totals | | $104,000.00 | | $108,075.00 |
| 1,300 shares Va. Chem, at 32 | | 41,600.00) | | |
| 1,300 shares Va. Chem, at 34 (?) | | 44,200.00} | | |
| Total | | 15,100.00 | and | $ 16,025.00 |

Satdy. 8/1

{ New York, }
{ Jul 31 1903 } Instructed P. & F. to sell at to-day's market.
{ C. B. C. }

700 Southern Pacific
100 Hocking Valley
500 Atchison Com
200 M. K. & T.

& take up at Sharp & Bryan 800. Vir. Chem Co. at $26,750.'

" * * * Upon receipt of said statement of account I examined it, and marked in lead pencil with cross-marks the names of the stocks directed to be sold by the plaintiff in her said letter. Upon consideration of the figures, I came to the conclusion that I would be unwilling to make the additional commitment involved in taking up the stock of the Virginia-Carolina Chemical Company mentioned in the plaintiff's said letter, unless she also gave me authority to sell her Atchison, Topeka & Santa Fé stock in addition to the stocks mentioned in her said letter. I therefore placed opposite the word 'Atchison' in lead pencil a '?' and thereafter conferred with the plaintiff as requested by her in her said letter. At such conference I undertook to take over the stock of the Virginia-Carolina Chemical Company on condition that the plaintiff would give me authority to sell her said Atchison stock in addition to the other stocks mentioned in her said letter, and directions to do so were given me by plaintiff. Thereupon on August 1, 1903, I directed Post & Flagg to sell at the ruling market prices for that day the 700 shares of Southern Pacific, the 100 shares of Hocking Valley, the 500 shares of Atchison, Topeka & Santa Fé, and the 200 shares of Missouri, Kansas & Texas. and * * * to take up at the brokerage firm of Sharp & Bryan 800 shares of the Virginia-Carolina Chemical Company, and to pay to the said Sharp & Bryan the plaintiff's debit balance against said stock, amounting to $26,-750. The statement in plaintiff's said letter, that there were 1,300 shares of stock of the Virginia-Carolina Chemical Company, turned out to be incorrect. The plaintiff only owned 800 shares of said stock. Finally, I directed the said Post & Flagg, upon receipt of the said 800 shares of stock of the Virginia-Carolina Chemical Company, to place the same in the said special account. * * * The total sum realized on August 3, 1903, from the sale of securities made on that date, was $69,312.50. * * * There remained for the benefit of plaintiff in the said 'H. Clay Pierce, Esq., Special' account, 400 shares of Union Pacific, 800 shares of Virginia-Carolina Chemical, and

100 shares of Hocking Valley, and against these * * * there was a net indebtedness on said date of $65,482.09. In the week commencing August 3, 1903, the brokerage house of Sharp & Bryan failed. Said brokerage house had been dealing extensively in the stock of the Virginia-Carolina Chemical Company, and upon their failure the price of said stock broke from approximately $32 a share to approximately $21 a share. * * * I was absent from the city during the week commencing August 3, 1903. During that week Post & Flagg for their protection sold the aforesaid 400 shares of Union Pacific on August 5, 1903, for $28,950, * * * and on August 6th the 800 shares of Virginia-Carolina for $16,725, * * * leaving in said account, after said last-mentioned sale, only 100 shares of the Hocking Valley Railroad Company, as against which there was a debit balance of $19,- 807.09. The said 100 shares of Hocking Valley were subsequently sold on August 19, 1903, for the net sum of * * * $7,187.50, leaving a debit balance in said account of $12,662.63, which I was, because of my guaranty of the account, subsequently obliged to pay, together with the accrued interest thereon; the total payment paid by me on account of principal and interest being $12,984.15. * * * Upon my return to the city in August, 1903, I learned that, because of the decline in the prices of the stock still contained, on August 3, 1903, in the account kept by me for the plaintiff with Post & Flagg, designated 'H. Clay Pierce, Esq., Special,' said remaining securities had been sold out by Post & Flagg, leaving the debit balance above referred to. * * * From the facts stated above and the records attached hereto, neither the 700 shares of Southern Pacific stock, nor the stock mentioned in this complaint, nor the stock taken over at plaintiff's request from Sharp & Bryan, was at any time placed to my personal account at the brokerage house of Post & Flagg. They were always kept together in a separate account for the plaintiff's benefit, and the plaintiff's loss was in no way due to any act of mine. I, in fact, mitigated what would otherwise have been her loss by paying her debit balance at the office of Post & Flagg."

Mrs. Rycroft and her two counsel admit in their affidavits that before the taking of the inquest they knew of the letter from her of July 30, 1903, quoted supra, and had a copy of it. It is true she denies that she ever had any conference with defendant or gave him any directions after the writing of such letter. In this she is flatly contradicted by the defendant, and he is corroborated to a considerable extent by documentary evidence. She is proceeding as upon a conversion on May 26, 1903, and she denies that she requested the defendant to take up or carry for her in the said special account the securities mentioned in the complaint, and reiterates the testimony which she gave upon the inquest, where she said that the first time that she learned that her account had not appeared in her name upon Post & Flagg's books was in June, 1909, and that she had never authorized or directed any person to transfer those securities in any other name or to any other account than her own.

In view of the fact that this lady was an experienced operator, who knew that brokers were in the habit of sending regular statements in regard to all open accounts in their offices, and the fact that she never received any from Post & Flagg, the fact that the Southern Pacific stock, which opened the H. Clay Pierce, Special, account in 1902, was ordered to be sold by her in her letter of July 30th, and is not included in her cause of action, the fact that the 800 shares of Virginia Chemical held in her name in the office of Sharp & Bryan were, as matter of fact, transferred from said office to Post & Flagg in accordance with her letter, which could

not have been done without her written authorization to Sharp & Bryan, and are not included in her cause of action, though transferred to the same account and treated in the same way as the items of which she does complain, are matters strongly corroborating the defendant's story, and throw grave doubt upon her testimony that she had no conference with him after the sending of said letter. It will be recalled that in said letter she wrote:

"I have held on to Va. Chemical just as long as I can—and I must let it go to-morrow unless we can arrange in this way—you sell my S. P. M. K. T. and Hocking Valley—and take over my Chemical."

Precisely what was done. It is not necessary for us at this time to hold that the defendant has made out a complete defense to the whole cause of action. Enough has been established to raise a strong presumption against the validity of the plaintiff's claim, at least in its entirety. Under such circumstances, in the interests of justice, we are unwilling to permit this judgment to stand. We think that a real trial should be had in open court, where the conflicting stories may be tested according to the course of the common law. The plaintiff does not meet the attack upon the integrity of her testimony, and of the judgment obtained thereon, made by the production of this letter, while she and her counsel admit that they were aware of it, and had a copy of it at the time of the inquest.

The averment is made by one of the counsel in his affidavit that there is evidence which deponent in justice to his client cannot at this time, without prejudice to her other case now pending, disclose here, which, in deponent's judgment, answers in an entirely satisfactory manner the claims of the defendant based upon this alleged letter as made by him. If plaintiff is not willing to disclose such alleged evidence in order to maintain her judgment, a trial ought to be had upon which both parties will have the opportunity to disclose all the facts and the whole truth touching their mutual relations.

The order appealed from should therefore be reversed, the motion granted, the default opened, and a new trial ordered, upon the following terms: That the judgment is to stand as security; that the defendant stipulates that, in the event of his death before the trial of this action, the action shall not abate, but shall continue against his estate, and that all the provisions of section 829 of the Code of Civil Procedure are and will be waived by him in respect to the testimony of the plaintiff upon any future trial of this action; that the full costs and disbursements of the action, to the present time, together with $500 counsel fee, be paid by the defendant; and that the case be placed upon the day calendar for speedy trial. Settle order on notice.

INGRAHAM, P. J., and McLAUGHLIN and LAUGHLIN, JJ., concur.

SCOTT, J. (dissenting). I dissent, and vote for an affirmance of the order. The undisputed facts compel the conclusion, to my

mind, that the defendant's default was intentional and premeditated. I cannot doubt that he left the city of New York without the slightest intention of returning until it suited his convenience to do so. He simply relied upon the facility with which defaults have commonly been opened in this city with no greater penalty than the imposition of a bill of costs. In my opinion, the defendant's deliberate default exhibited a clear contempt of the power or willingness of the court to assert its authority. The former order of this court authorized the defendant to renew his application at Special Term to open the default "upon satisfactory proof that the defendant was unable to come to New York to be present at the trial of the case *and* that he has a defense on the merits." He certainly has not established by satisfactory proof that he was unable to come to New York, and the prevailing opinion does not refer to any such proof. On the contrary, the proof is all to the effect that he could have returned, if he had chosen, although, perhaps, at some personal inconvenience.

As to the merits, the defendant now offers a radically different defense from that pleaded in his answer, and one which, upon the present state of the pleadings, he could not prove. His answer denies liability, because plaintiff's stocks were sold by Post & Flagg, his brokers, without his knowledge or authority. He now says that the stocks were sold by his orders and authority, upon the faith of a letter written to him by plaintiff which he treats as a direction to sell, although there is certainly some ground for her contention that it merely sought advice. The defendant has, therefore, neither excused his nonappearance nor shown a good defense upon the pleadings as they stand, and in my opinion is not entitled to the favor of the court.